UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| | Civil No. |
| ROBERT MARTIN,<br>517 Sequoia Lane<br>Highland, CA 92346 ) | DEMAND FOR JURY TRIAL |
| )<br>)<br>) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| XM SATELLITE RADIO HOLDINGS INC., )<br>1500 Eckington Place NE, Washington, DC )<br>20002-2194 and HUGH PANERO, 1500 )<br>Eckington Place NE, Washington, DC 20002- )<br>2194, | |
| )<br>Defendants. | |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

**PARTIES**

6.    Plaintiff Robert Martin, as set forth in the accompanying certification and incorporated by reference herein, purchased the publicly traded securities of XM at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant XM is incorporated in Delaware and maintains its headquarters at 1500 Eckington Place NE, Washington, DC 20002-2194. XM operates as a satellite radio service company primarily in the United States.

8.    Defendant Hugh Panero ("Panero") is, and was at all relevant times, Chief Executive Officer ("CEO"), President and a member of XM's Board of Directors.

9.    During the Class Period, Panero, as a senior executive officer and/or director of XM, was privy to confidential and proprietary information concerning XM, its operations, finances, financial condition and present and future business prospects. Panero also had access to material adverse non-public information concerning XM, as discussed in detail below. Because of his positions with XM, Panero had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to him in connection therewith. Because of his possession of such information, Panero knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

10.    Panero is liable as a direct participant in the wrongs complained of herein. In addition, Panero, by reason of his status as a senior executive officer and/or director, was a "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because

of his positions of control, Panero was able to and did, directly or indirectly, control the conduct of XM's business.

11.    Panero, because of his positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. Panero was provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Panero had the opportunity to commit the fraudulent acts alleged herein.

12.    As a senior executive officer and/or director and as a controlling person of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ") and governed by the federal securities laws, Panero had a duty to disseminate promptly accurate and truthful information with respect to XM's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of XM's securities would be based upon truthful and accurate information. Panero's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    Panero is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of XM's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding XM's business, operations and management and the intrinsic value of XM's securities; (ii) enabled Panero and other Company insiders to sell 2.66 million shares of their personally-held XM stock for gross proceeds in excess of $75.8 million; and (iii) caused

plaintiff and members of the Class to purchase XM's publicly traded securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the publicly-traded securities of XM between July 28, 2005 to May 24, 2006, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, XM's stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by XM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- 4 -

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of XM;

(c)    whether the prices of XM's publicly traded securities were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    Defendant XM describes itself as "America's number one satellite radio service with more than 6.5 million subscribers."

21.    In the satellite radio industry, there are two companies that compete for customers: XM and Sirius Satellite Radio Inc. ("Sirius"). Unlike conventional radio, which can be listened to through any radio device for free, satellite radio is a paid service that requires a special receiver, which must also be purchased by customers. The services cost about $13 a month and offer various channels of talk and news as well as commercial-free music.

22.    Since they first began operations, XM and Sirius have been engaged in an expensive battle to line up listeners and programming for their pay radio services and have consistently reported large losses as a result.

23.    In October 2004, Sirius announced that it signed shock jock Howard Stern to a five year contract to move his program over from conventional radio to satellite radio. The Stern programming was set to commence in January 2006.

24.    Prior to the fourth quarter of 2005, XM was growing at a faster pace than Sirius. However, with the impending arrival of Stern on Sirius, XM realized that many potential and existing customers would be flocking to Sirius. In anticipation of Stern's arrival on Sirius, XM began to significantly increase its marketing efforts, at great cost to the Company. Nevertheless, in public statements to investors, defendants represented that the Company expected to exceed nine million subscribers by year-end of 2006 and had been successful in lowering the Company's acquisition cost per customer and would continue to be able to do so. In fact, the Company showed improvements in the acquisition cost per customer in the second and third quarters of 2005.

25.    On February 16, 2006, the Company announced a much wider loss in the fourth quarter on higher costs for marketing and acquiring subscribers. The Company announced that its subscriber acquisition cost per customer was $89, compared to $64 in the same period of the prior year. The Company admitted that the increase was due to a "one-time competitive event in the fourth quarter," *i.e.* the arrival of Howard Stern on Sirius.

26.    On that same day, the Company also announced the resignation of one of its directors, Pierce J. Roberts ("Roberts"). According to his resignation letter, Mr. Roberts was "troubled about the current direction of the company." Moreover, Mr. Roberts stated that "[g]iven current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes now."

27.    Following these announcements, shares of XM's common stock declined $1.27 per share, or 5%, to close at $23.98 per share, on heavy trading volume. The Company's stock

continued to decline on the next trading day, falling $2.41 per share, or 11%, to close at $21.57 per share.

28.    On April 27, 2006, the Company announced that it received a letter from the Federal Trade Commission ("FTC") stating that the FTC is conducting an inquiry into whether the Company is in violation of the FTC Act, the Telemarketing Sales Rule, the Truth in Lending Act and the CAN-SPAM Act. As part of the inquiry, the FTC requested information from the Company with regard to its marketing activities, including free trial periods, rebates, telemarketing activities, billing and customer complaints.    Moreover, the Company also received a letter from the Federal Communications Commission ("FCC") stating that the transmitter in XM's "Delphi XM SKYFi2 radio" was not in compliance with the applicable emission limits. Following these announcements, shares of XM fell $1.21 per share, or 6%, to close at $20.80 per share, on heavy trading volume.

29.    Then, on May 24, 2006, the Company announced that it was reducing its subscriber guidance for 2006 from 9 million to 8.5 million. Upon this announcement, shares of XM fell $1.76 per share, or 13%, to close at $13.75 per share, on heavy trading volume.

**Materially False and Misleading**
**Statements Made During the Class Period**

30.    The Class Period begins on July 28, 2005. On that date, the Company issued a press release announcing its financial results for the second quarter of 2005, the period ended June 30, 2005. For the quarter, XM reported revenue of $125 million, a net loss of $146.6 million and net subscriber additions of 647,226. XM further stated that:

> With XM's first half performance and an even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers.

* * * *

> Efficient Quarterly Subscriber Growth
>
> XM's second quarter subscriber growth was strong across both the retail aftermarket and automotive distribution channels. *Second quarter 2005 Cost Per Gross Addition*

*(CPGA) was $98, an improvement of $3, or 3 percent, from the $101 CPGA reported in the second quarter 2004. XM's CPGA is the fully-loaded cost to acquire each new subscriber, including Subscriber Acquisition Costs (SAC) of $50, as well as advertising and marketing expenses.*

31.    XM's financial results for the second quarter of 2005, the period ended June 30, 2005, were reported in the Company's Report on Form 10-Q filed with the SEC on or about August 5, 2005, which was signed by defendant Panero.

32.    On September 27, 2005, the Company issued a press release announcing that it surpassed 5 million subscribers. Defendant Panero, commenting on the achieved milestone, stated, in pertinent part, as follows:

> With more than five million subscribers today, XM continues to expand its position as the leader in the satellite radio industry. We are on track to have more than six million subscribers by the end of this year. Consumers are choosing XM because we offer the most choices, including the most commercial-free music and live sporting events, and the most advanced technology. With the winning combination of outstanding new channels and breakthrough products in advance of the holiday season, XM is poised for record growth during the fourth quarter.

33.    On October 3, 2005, the Company issued a press release announcing that it added more than 617,000 new net subscribers during the third quarter of 2005 for a total of more than 5.03 million subscribers. Defendant Panero stated, in pertinent part, as follows:

> This continues to be a phenomenal year for XM Satellite Radio, with more than 1.8 million new net subscribers since the beginning of 2005. During the third quarter, we increased our lead as the number-one satellite radio company by topping five million subscribers, and we expect to surpass six million by the end of the year. This was our best third quarter ever, and with a tremendous line-up of new products and programming choices, we expect the fourth quarter to be the most successful in the history of our company.

34.    On October 27, 2005, the Company issued a press release announcing its financial results for the third quarter of 2005, the period ended September 30, 2005. For the quarter, XM reported net subscriber additions of 617,152, a net loss of $131.9 million and revenue of $153 million. The press release continued, in pertinent part, as follows:

Record Revenue from Cost-Effective Subscriber Growth

- 8 -

For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004. XM's third quarter subscriber growth was driven by strong automotive and retail distribution performance with a range of full-featured products. ***Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 was $89.*** XM products are well stocked for the holiday season and XM expects to accelerate its subscriber and revenue growth through the fourth quarter.

35.    XM's financial results for the third quarter of 2005, the period ended September 30, 2005, were reported in the Company's Report on Form 10-Q filed with the SEC on or about November 7, 2005, which was signed by defendant Panero.

36.    On January 4, 2006, the Company issued a press release announcing that it projects more than nine million customers by year-end of 2006. The press release continued, in pertinent part, as follows:

XM Satellite Radio, the nation's leading satellite radio company, today announced that it has more than six million subscribers, and projected it will end 2006 with more than nine million subscribers on the strength of breakthrough products introduced today at the Consumer Electronics Show, its powerful content lineup and growth in the factory-installed new car market. XM extended its lead over its competitor in 2005 by adding 2.7 million net new subscribers, and expects more than three million net new subscribers in 2006.

The latest XM subscriber numbers come as the company launches the most innovative and highly anticipated products in its history: the world's first portable, handheld devices that receive live satellite radio programming and play MP3 music, combining the two most popular forms of audio entertainment of the past 20 years.

"XM added a record number of new subscribers in 2005, representing 84 percent growth over prior year ending subscribers," said Hugh Panero, President and CEO, XM Satellite Radio. "We have more than six million subscribers today, and we expect to reach more than nine million subscribers by the end of 2006."

37.    The statements referenced above in ¶¶30, 32-34, 36 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts:

(a)    that the Company would be required to dramatically increase its marketing and acquisition costs to attract subscribers to compete with Sirius;

(b)    that the Company was experiencing decreased subscriber additions;

(c)    that the Company was engaging in improper marketing tactics;

(d)    that the Company was subject to heightened regulatory risks associated with its marketing efforts; and

(e)    that, as a result of the foregoing, the Company's future revenue streams and growth would be in serious doubt and defendants' statements projecting over nine million customers by year end of 2006 were lacking in a reasonable and/or legitimate basis at all relevant times.

### The Truth Begins to Emerge

38.    On February 16, 2006, prior to the opening of the trading day, the Company issued a press release announcing its financial results for the fourth quarter and year end of 2005, the period ended December 31, 2005. The Company announced a much wider loss in the quarter on higher costs for marketing and acquiring subscribers. However, the Company remained confident that it would exceed nine million subscribers by year end. The press release revealed, in pertinent part, as follows:

> "2005 was a significant growth year for XM in which we added more than 2.7 million net subscribers," said Hugh Panero, President and CEO of XM Satellite Radio. *"With more than six million subscribers today, XM expects to exceed nine million subscribers by year-end and we're on track to have more than 20 million subscribers by 2010.* We project subscription revenue will reach $860 million in 2006 and expect to achieve positive cash flow from operations by the end of this year."

> Panero continued, "Last week, we reinforced XM's position as the premium content leader across all of radio with our announcement of the "Oprah & Friends" channel that will complement our music, talk and sports programming starting in September."

> XM ended 2005 with 5,932,957 subscribers, an increase of 84 percent over 2004. Despite an intensely competitive marketplace in the fourth quarter, XM achieved net subscriber additions of 898,315. Later than expected activations from strong holiday sales brought the total to more than six million during the first week of January.

> "XM achieved significant growth, added quality content and signed up important new automotive distribution partners in 2005," Panero said. "At the start of 2005, XM had 3.2 million subscribers and led the satellite radio competition by 2.1 million subscribers. Over the course of the year, XM increased that lead to 2.6 million subscribers."

Fourth Quarter and Full-Year Financial Results

For the fourth quarter of 2005, XM reported quarterly total revenue of $177 million, an increase of 113 percent over the $83.1 million total revenue reported in fourth quarter of 2004. XM's full year 2005 total revenue was $558.3 million, an increase of 128 percent over the $244.4 million total revenue recorded in 2004. These quarterly and annual increases in revenue were driven by our significant subscriber growth and increases in average revenue per subscriber in connection with our price increase implemented in the second quarter of 2005.

*For the fourth quarter, subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $89 compared to $64 in the same period last year. CPGA in the fourth quarter was $141 compared to $104 in the same period last year. These increases were primarily due to higher marketing expenses to meet a one-time competitive event in the fourth quarter.* For full year 2005, SAC was $64, a slight increase from $62 in 2004, and CPGA was $109, compared to $100 in 2004. In the first quarter of 2006, XM expects a more normalized market environment and projects that SAC and CPGA will decrease in 2006.

XM reported an EBITDA loss of ($199.4) million for the fourth quarter of 2005, including $25.3 million in de-leveraging charges, compared to an EBITDA loss of ($139.7) million for the fourth quarter of 2004, which included $41.6 million in de-leveraging charges. The full year EBITDA loss was ($434.3) million, including $27.6 million in de-leveraging charges, compared to a 2004 EBITDA loss of ($388.4) million which included $76.6 million of de-leveraging charges. *The increased EBITDA loss primarily resulted from our increase in subscribers as well as the higher fourth quarter marketing expenses.*

39.    On February 16, 2006, the Company also announced the resignation of one of its directors, Roberts. In a Form 8-K filed with the SEC, the Company attached the resignation letter from Roberts to the Company's Chairman, Gary M. Parsons, which stated, in pertinent part, as follows:

Dear Gary:

It has been my pleasure to serve on the Board of Directors of XM for more than 5 years. The company has achieved many notable successes and overcome numerous seemingly-insurmountable obstacles during this period. It has been great fun to have a minor role in helping you, Hugh and the XM team as the company has grown from its founding concept to become a major firm with rapidly growing numbers of subscribers. There is much in which to be pleased.

*That said, I have been troubled about the current direction of the company and do not believe that it is in the best interest of the company's shareholders.* For some time I have made my analyses and observations known in an increasingly vociferous manner to the Board and a number of senior managers of the Company. I am not

- 11 -

having any useful effect and I care too much and believe in my own views too much to just "go along".

*Given current course and speed there is, in my view, a significant chance of a crisis on the horizon. Even absent a crisis, I believe that XM will inevitably serve its shareholders poorly without major changes now.* It is clear to me that I cannot be part of the solution and I will not be part of the problem.

Therefore, after a lot of thought and with a great deal of sadness, I tender my resignation to be effective immediately. Thanks and best wishes to the entire XM family.

40.    Following these announcements, shares of XM's common stock declined $1.27 per share, or 5%, to close at $23.98 per share, on heavy trading volume. The Company's stock continued to decline on the next trading day, falling $2.41 per share, or 11%, to close at $21.57 per share.

41.    On April 3, 2006, the Company issued a press release announcing that it added more than 568,000 net new subscribers during the first quarter of 2006 and remains on track to reach nine million subscribers by the end of 2006. Defendant Panero commented as follows:

"The first quarter represented another solid quarter of growth in XM subscribers, and is consistent with our goal of nine million subscribers by year end. More importantly, our subscriber growth was achieved economically, with a substantial reduction in the cost to acquire a new subscriber as compared to the fourth quarter of 2005."

42.    On April 27, 2006, the Company issued a press release announcing its financial results for the first quarter of 2006, the period ended March 31, 2006. For the quarter, XM reported net subscriber additions of 568,902, revenue of $208 million, an EBITDA loss of $83.5 million and a net loss of $149.2 million . Defendant Panero stated, in pertinent part, as follows:

XM delivered solid results on key financial metrics during the first quarter. XM added more than 568,000 new subscribers at efficient subscriber acquisition cost levels. XM is positioned for continued strong growth in 2006 with our outstanding content and the introduction of five new radio models, including our revolutionary XM/MP3 players. *With our first quarter subscriber growth, we remain on track to reach nine million subscribers and positive cash flow from operations by year end.*

The press release continued, in pertinent part, as follows:

First Quarter Financial Results

For the first quarter 2006, XM reported revenue of $208 million, an increase of over 100 percent from the $103 million reported in first quarter 2005. The quarterly increase in revenue was driven by significant subscriber growth year over year, and increases in average revenue per subscriber in connection with our price increase implemented in the second quarter of 2005. For the first quarter of 2006, XM's subscriber acquisition cost (SAC), a component of cost per gross addition (CPGA) was $62 compared to $89 in the fourth quarter of 2005 and $52 in the first quarter of 2005. CPGA was $94 compared to $141 in the fourth quarter of 2005 and $90 in the first quarter of 2005.

43.    Also on April 27, 2006, the Company filed a Form 8-K with the SEC announcing that the Federal Trade Commission has launched an inquiry regarding the company's marketing activities. The 8-K stated, in pertinent part, as follows:

In the ordinary course of business, we become aware from time to time of claims, potential claims or investigations, or may become party to legal proceedings arising out of various matters, such as contract matters, employment related matters, issues relating to our repeater network, product liability issues, copyright, patent, trademark or other intellectual property matters and other federal regulatory matters.

On April 25, 2006, we received a letter from the Federal Communications Commission stating that its Office of Engineering and Technology Laboratory has tested the Delphi XM SKYFi2 radio and has determined that its *transmitter is not in compliance with the applicable emission limits.* The letter seeks information from us regarding the testing, emissions and other matters relating to this radio. We are conducting an internal review, and anticipate responding to the letter shortly and cooperating fully.

*Also on April 25, 2006, we received a letter from the Federal Trade Commission stating that they are conducting an inquiry into whether our activities are in compliance with various acts, including the FTC Act, the Telemarketing Sales Rule, the Truth in Lending Act and the CAN-SPAM Act. This letter requests information about a variety of our marketing activities, including free trial periods, rebates, telemarketing activities, billing and customer complaints.* We are conducting an internal review of these matters, and anticipate responding to the letter shortly and cooperating fully with this investigation.

XM believes that it is too early in the process to determine the significance, if any, of these matters to our business, consolidated results of operations or financial position. [Emphasis added.]

44.    Following these announcements, shares of XM fell $1.21 per share, or 6%, to close at $20.80 per share, on heavy trading volume.

45.    The statements referenced above in ¶¶38, 41-43 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts:

(a)    that the Company was engaging in improper marketing tactics;

(b)    that the Company was subject to heightened regulatory risks associated with its marketing efforts; and

(c)    that, as a result of the foregoing, the Company's future revenue streams and growth would be in serious doubt and defendants' statements projecting over nine million customers by year end of 2006 were lacking in a reasonable and/or legitimate basis at all relevant times.

46.    Then, on May 24, 2006, the Company issued a press release announcing that it is revising downward its subscriber guidance for 2006. The press release revealed, in pertinent part, as follows:

XM Satellite Radio Holdings Inc. (NASDAQ:XMSR) today reported a change to its subscriber and financial guidance for 2006, *projecting that it will end 2006 with 8.5 million subscribers*, resulting in subscriber revenues of $835 million and EBITDA loss (excluding stock-based compensation, other income/expense, equity in net losses of affiliates, and loss from deleveraging transactions) of $235 million. XM reaffirmed that it remains on track to have positive cash flow from operations for the fourth quarter of 2006 and on an annual basis for 2007.

"Subscriber growth for the first quarter of 2006 was consistent with our initial guidance of nine million subscribers by the end of 2006," said Hugh Panero, President and CEO of XM Satellite Radio. "Although XM has regained retail market share since the first of the year, the satellite radio category has seen an overall softness at retail during the second quarter to date, and we have been later than anticipated with broad availability of our new products."

The revised guidance of 8.5 million subscribers represents growth of more than 40 percent over the course of the year. The revised subscriber guidance leads to a reduction in subscriber revenues and a narrower EBITDA loss for the year. XM expects to add a total of more than 2.5 million net new subscribers this year. XM ended 2005 with 5,932,957 subscribers, and the company added more than 568,000 net new subscribers during the first quarter of 2006 for a total of more than 6.5 million subscribers. XM is currently working through regulatory and legal challenges, the resolution of which could affect future product availability and operating results, and require us to review this revised guidance.

- 14 -

47.    Upon this announcement, shares of XM fell $1.76 per share, or 13%, to close at $13.75 per share, on heavy trading volume.

48.    The markets for XM's securities were open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, XM's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired XM's securities relying upon the integrity of the market price of XM's securities and market information relating to XM, and have been damaged thereby.

49.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of XM's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

50.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about XM's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of XM and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing

- 15 -

the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

51.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding XM, their control over, and/or receipt and/or modification of XM's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning XM, participated in the fraudulent scheme alleged herein.

52.    Defendants were further motivated to engage in this course of conduct in order to allow Panero and other Company insiders to sell 2.66 million shares of their personally-held XM stock for gross proceeds in excess of $75.8 million. The insider shares sold during the Class Period are set forth more fully in the following chart:

| Last Name | First Name | Date | Shares | Price | Proceeds |
|-----------|-----------|------|--------|-------|----------|
| COOK | STEPHEN | 12/6/2005 | 30,000 | $28.52 | $855,600 |
| | | 12/6/2005 | 20,000 | $28.55 | $571,000 |
| | | 12/6/2005 | 10,000 | $28.52 | $285,200 |
| | | 12/6/2005 | 10,000 | $28.46 | $284,600 |
| | | 12/6/2005 | 8,514 | $28.53 | $242,904 |
| | | | 78,514 | | $2,239,304 |
| | | | | | |
| HAYWOOD | GEORGE | 11/8/2005 | 54,513 | $28.90 | $1,575,426 |
| | | 11/8/2005 | 27,903 | $29.15 | $813,372 |
| | | 11/8/2005 | 22,459 | $29.51 | $662,765 |
| | | 11/8/2005 | 20,824 | $29.05 | $604,937 |
| | | 11/8/2005 | 20,111 | $29.00 | $583,219 |
| | | 11/8/2005 | 19,794 | $28.67 | $567,494 |
| | | 11/8/2005 | 18,827 | $29.50 | $555,397 |
| | | 11/8/2005 | 16,536 | $29.01 | $479,709 |
| | | 11/8/2005 | 14,461 | $28.93 | $418,357 |
| | | 11/8/2005 | 13,942 | $28.66 | $399,578 |
| | | 11/8/2005 | 13,861 | $28.72 | $398,088 |
| | | 11/8/2005 | 12,703 | $28.92 | $367,371 |
| | | 11/8/2005 | 12,653 | $28.75 | $363,774 |
| | | 11/8/2005 | 12,437 | $28.74 | $357,439 |
| | | 11/8/2005 | 11,700 | $29.07 | $340,119 |
| | | 11/8/2005 | 9,540 | $29.55 | $281,907 |
| | | 11/8/2005 | 8,806 | $28.91 | $254,581 |
| | | 11/8/2005 | 8,500 | $28.77 | $244,545 |
| | | 11/8/2005 | 8,380 | $29.04 | $243,355 |
| | | 11/8/2005 | 7,569 | $28.99 | $219,425 |
| | | 11/8/2005 | 7,000 | $29.10 | $203,700 |
| | | 11/8/2005 | 6,700 | $28.94 | $193,898 |
| | | 11/8/2005 | 6,567 | $28.76 | $188,867 |
| | | 11/8/2005 | 6,328 | $28.78 | $182,120 |
| | | 11/8/2005 | 5,754 | $29.19 | $167,959 |
| | | 11/8/2005 | 5,700 | $28.98 | $165,186 |
| | | 11/8/2005 | 5,520 | $29.03 | $160,246 |
| | | 11/8/2005 | 5,171 | $29.52 | $152,648 |
| | | 11/8/2005 | 5,000 | $28.70 | $143,500 |
| | | 11/8/2005 | 4,954 | $28.71 | $142,229 |
| | | 11/8/2005 | 3,400 | $29.02 | $98,668 |
| | | 11/8/2005 | 3,300 | $28.97 | $95,601 |
| | | 11/8/2005 | 2,796 | $28.79 | $80,497 |
| | | 11/8/2005 | 2,700 | $29.61 | $79,947 |
| | | 11/8/2005 | 1,948 | $28.65 | $55,810 |
| | | 11/8/2005 | 1,806 | $29.06 | $52,482 |
| | | 11/8/2005 | 1,545 | $29.53 | $45,624 |
| | | 11/8/2005 | 1,300 | $29.60 | $38,480 |
| | | 11/8/2005 | 900 | $28.80 | $25,920 |
| | | 11/8/2005 | 900 | $29.17 | $26,253 |
| | | 11/8/2005 | 800 | $29.18 | $23,344 |

| | | 11/8/2005 | 700 | $28.73 | $20,111 |
|---|---|---|---|---|---|
| | | 11/8/2005 | 700 | $29.09 | $20,363 |
| | | 11/8/2005 | 600 | $29.08 | $17,448 |
| | | 11/8/2005 | 355 | $29.56 | $10,494 |
| | | 11/8/2005 | 300 | $28.69 | $8,607 |
| | | 11/8/2005 | 300 | $29.16 | $8,748 |
| | | 11/8/2005 | 200 | $29.54 | $5,908 |
| | | 11/8/2005 | 100 | $28.95 | $2,895 |
| | | 11/8/2005 | 100 | $29.57 | $2,957 |
| | | 11/9/2005 | 59,267 | $28.10 | $1,665,403 |
| | | 11/9/2005 | 27,221 | $28.30 | $770,354 |
| | | 11/9/2005 | 19,814 | $28.12 | $557,170 |
| | | 11/9/2005 | 17,115 | $28.40 | $486,066 |
| | | 11/9/2005 | 16,968 | $28.34 | $480,873 |
| | | 11/9/2005 | 16,050 | $28.20 | $452,610 |
| | | 11/9/2005 | 14,590 | $28.39 | $414,210 |
| | | 11/9/2005 | 13,052 | $28.22 | $368,327 |
| | | 11/9/2005 | 13,000 | $29.00 | $377,000 |
| | | 11/9/2005 | 11,700 | $28.33 | $331,461 |
| | | 11/9/2005 | 11,320 | $27.88 | $315,602 |
| | | 11/9/2005 | 10,617 | $28.35 | $300,992 |
| | | 11/9/2005 | 9,226 | $28.36 | $261,649 |
| | | 11/9/2005 | 9,050 | $28.31 | $256,206 |
| | | 11/9/2005 | 8,250 | $28.41 | $234,383 |
| | | 11/9/2005 | 8,218 | $28.32 | $232,734 |
| | | 11/9/2005 | 8,000 | $28.90 | $231,200 |
| | | 11/9/2005 | 7,800 | $28.46 | $221,988 |
| | | 11/9/2005 | 7,700 | $28.43 | $218,911 |
| | | 11/9/2005 | 6,439 | $28.75 | $185,121 |
| | | 11/9/2005 | 6,161 | $28.70 | $176,821 |
| | | 11/9/2005 | 6,100 | $28.81 | $175,741 |
| | | 11/9/2005 | 5,780 | $28.27 | $163,401 |
| | | 11/9/2005 | 5,750 | $28.44 | $163,530 |
| | | 11/9/2005 | 5,100 | $28.42 | $144,942 |
| | | 11/9/2005 | 4,700 | $28.26 | $132,822 |
| | | 11/9/2005 | 4,616 | $28.45 | $131,325 |
| | | 11/9/2005 | 4,448 | $28.23 | $125,567 |
| | | 11/9/2005 | 4,000 | $28.72 | $114,880 |
| | | 11/9/2005 | 3,601 | $28.89 | $104,033 |
| | | 11/9/2005 | 3,500 | $28.62 | $100,170 |
| | | 11/9/2005 | 3,432 | $28.50 | $97,812 |
| | | 11/9/2005 | 3,350 | $28.65 | $95,978 |
| | | 11/9/2005 | 3,202 | $28.51 | $91,289 |
| | | 11/9/2005 | 2,900 | $28.83 | $83,607 |
| | | 11/9/2005 | 2,798 | $28.25 | $79,044 |
| | | 11/9/2005 | 2,500 | $28.47 | $71,175 |
| | | 11/9/2005 | 2,500 | $28.52 | $71,300 |
| | | 11/9/2005 | 2,444 | $28.92 | $70,680 |
| | | 11/9/2005 | 2,198 | $28.11 | $61,786 |
| | | 11/9/2005 | 2,030 | $29.01 | $58,890 |

| | | | | | |
|---|---|---|---|---|---|
| | | 11/9/2005 | 1,918 | $28.38 | $54,433 |
| | | 11/9/2005 | 1,842 | $28.28 | $52,092 |
| | | 11/9/2005 | 1,800 | $29.03 | $52,254 |
| | | 11/9/2005 | 1,700 | $28.69 | $48,773 |
| | | 11/9/2005 | 1,700 | $28.80 | $48,960 |
| | | 11/9/2005 | 1,602 | $28.24 | $45,240 |
| | | 11/9/2005 | 1,500 | $28.54 | $42,810 |
| | | 11/9/2005 | 1,500 | $28.84 | $43,260 |
| | | 11/9/2005 | 1,300 | $28.48 | $37,024 |
| | | 11/9/2005 | 1,300 | $28.71 | $37,323 |
| | | 11/9/2005 | 1,300 | $28.91 | $37,583 |
| | | 11/9/2005 | 1,100 | $28.55 | $31,405 |
| | | 11/9/2005 | 968 | $28.49 | $27,578 |
| | | 11/9/2005 | 950 | $28.73 | $27,294 |
| | | 11/9/2005 | 800 | $28.63 | $22,904 |
| | | 11/9/2005 | 800 | $28.82 | $23,056 |
| | | 11/9/2005 | 700 | $28.57 | $19,999 |
| | | 11/9/2005 | 699 | $28.88 | $20,187 |
| | | 11/9/2005 | 500 | $28.76 | $14,380 |
| | | 11/9/2005 | 500 | $28.86 | $14,430 |
| | | 11/9/2005 | 400 | $28.85 | $11,540 |
| | | 11/9/2005 | 350 | $28.37 | $9,930 |
| | | 11/9/2005 | 300 | $28.58 | $8,574 |
| | | 11/9/2005 | 200 | $28.87 | $5,774 |
| | | 11/9/2005 | 200 | $29.04 | $5,808 |
| | | 11/9/2005 | 198 | $28.56 | $5,655 |
| | | 11/9/2005 | 100 | $28.74 | $2,874 |
| | | 11/10/2005 | 306,649 | $28.13 | $8,626,036 |
| | | 11/10/2005 | 250,100 | $28.16 | $7,042,816 |
| | | 11/10/2005 | 63,448 | $28.15 | $1,786,061 |
| | | 11/10/2005 | 42,435 | $28.12 | $1,193,272 |
| | | 11/10/2005 | 42,360 | $28.47 | $1,205,989 |
| | | 11/10/2005 | 41,558 | $28.45 | $1,182,325 |
| | | 11/10/2005 | 39,795 | $28.40 | $1,130,178 |
| | | 11/10/2005 | 36,311 | $28.50 | $1,034,864 |
| | | 11/10/2005 | 32,624 | $28.29 | $922,933 |
| | | 11/10/2005 | 26,059 | $28.34 | $738,512 |
| | | 11/10/2005 | 25,923 | $28.20 | $731,029 |
| | | 11/10/2005 | 25,707 | $28.48 | $732,135 |
| | | 11/10/2005 | 25,439 | $28.10 | $714,836 |
| | | 11/10/2005 | 25,000 | $28.55 | $713,750 |
| | | 11/10/2005 | 22,526 | $28.38 | $639,288 |
| | | 11/10/2005 | 21,924 | $28.00 | $613,872 |
| | | 11/10/2005 | 19,512 | $28.14 | $549,068 |
| | | 11/10/2005 | 15,510 | $28.37 | $440,019 |
| | | 11/10/2005 | 14,727 | $28.39 | $418,100 |
| | | 11/10/2005 | 14,700 | $28.41 | $417,627 |
| | | 11/10/2005 | 13,737 | $28.36 | $389,581 |
| | | 11/10/2005 | 10,558 | $28.42 | $300,058 |
| | | 11/10/2005 | 9,883 | $28.43 | $280,974 |

| | | | | | |
|---|---|---|---|---|---|
| | | 11/10/2005 | 9,881 | $28.07 | $277,360 |
| | | 11/10/2005 | 8,853 | $28.18 | $249,478 |
| | | 11/10/2005 | 8,810 | $28.44 | $250,556 |
| | | 11/10/2005 | 8,675 | $27.90 | $242,033 |
| | | 11/10/2005 | 8,538 | $28.49 | $243,248 |
| | | 11/10/2005 | 8,450 | $28.17 | $238,037 |
| | | 11/10/2005 | 7,937 | $28.19 | $223,744 |
| | | 11/10/2005 | 7,352 | $28.05 | $206,224 |
| | | 11/10/2005 | 7,068 | $28.11 | $198,681 |
| | | 11/10/2005 | 6,763 | $28.25 | $191,055 |
| | | 11/10/2005 | 6,263 | $28.68 | $179,623 |
| | | 11/10/2005 | 5,000 | $27.85 | $139,250 |
| | | 11/10/2005 | 4,486 | $28.46 | $127,672 |
| | | 11/10/2005 | 3,544 | $27.94 | $99,019 |
| | | 11/10/2005 | 2,726 | $28.51 | $77,718 |
| | | 11/10/2005 | 2,700 | $27.91 | $75,357 |
| | | 11/10/2005 | 2,600 | $27.96 | $72,696 |
| | | 11/10/2005 | 2,468 | $28.52 | $70,387 |
| | | 11/10/2005 | 1,500 | $27.95 | $41,925 |
| | | 11/10/2005 | 1,443 | $28.03 | $40,447 |
| | | 11/10/2005 | 1,234 | $28.54 | $35,218 |
| | | 11/10/2005 | 1,200 | $27.93 | $33,516 |
| | | 11/10/2005 | 1,000 | $27.92 | $27,920 |
| | | 11/10/2005 | 836 | $27.87 | $23,299 |
| | | 11/10/2005 | 700 | $28.08 | $19,656 |
| | | 11/10/2005 | 683 | $28.53 | $19,486 |
| | | 11/10/2005 | 600 | $28.09 | $16,854 |
| | | 11/10/2005 | 432 | $27.89 | $12,048 |
| | | 11/10/2005 | 289 | $28.06 | $8,109 |
| | | 11/10/2005 | 227 | $28.01 | $6,358 |
| | | 11/10/2005 | 200 | $28.04 | $5,608 |
| | | | 2,070,640 | | $58,835,464 |
| | | | | | |
| PANERO | HUGH | 12/6/2005 | 74,820 | $28.41 | $2,125,636 |
| | | 12/6/2005 | 50,000 | $28.53 | $1,426,500 |
| | | 12/6/2005 | 30,000 | $28.80 | $864,000 |
| | | 12/6/2005 | 30,000 | $28.52 | $855,600 |
| | | 12/6/2005 | 25,000 | $28.40 | $710,000 |
| | | 12/6/2005 | 23,514 | $28.55 | $671,325 |
| | | 12/6/2005 | 20,000 | $28.46 | $569,200 |
| | | 12/6/2005 | 20,000 | $28.38 | $567,600 |
| | | 12/6/2005 | 20,000 | $28.37 | $567,400 |
| | | 12/6/2005 | 10,000 | $28.95 | $289,500 |
| | | 12/6/2005 | 10,000 | $28.94 | $289,400 |
| | | 12/6/2005 | 10,000 | $28.90 | $289,000 |
| | | 12/6/2005 | 10,000 | $28.88 | $288,800 |
| | | 12/6/2005 | 10,000 | $28.78 | $287,800 |
| | | 12/6/2005 | 10,000 | $28.77 | $287,700 |
| | | 12/6/2005 | 10,000 | $28.64 | $286,400 |
| | | 12/6/2005 | 10,000 | $28.58 | $285,800 |

| | | | 12/6/2005 | 10,000 | $28.52 | $285,200 |
|---|---|---|---|---|---|---|
| | | | 12/6/2005 | 10,000 | $28.49 | $284,900 |
| | | | 12/6/2005 | 10,000 | $28.47 | $284,700 |
| | | | 12/6/2005 | 10,000 | $28.46 | $284,600 |
| | | | | 413,334 | | $11,801,061 |
| | | | | | | |
| TITLEBAUM | JOSEPH | | 12/6/2005 | 103,514 | $28.44 | $2,943,483 |
| | | | | | | |
| | | | Total: | 2,666,002 | | $75,819,312 |

## LOSS CAUSATION/ECONOMIC LOSS

53.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of XM's securities and operated as a fraud or deceit on Class Period purchasers of XM's securities by issuing aggressive statements and opinions concerning the Company's ability to control costs, increase subscribers and become profitable.   When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of XM's securities fell precipitously as the prior artificial inflation came out.  As a result of their purchases of XM's securities during the Class Period, plaintiff and the other Class members suffered economic loss, i.e., damages under the federal securities laws.

54.    By falsely representing that the Company would be able to exceed nine million customers by year end of 2006 and by failing to disclose that the Company was incurring a material increase in its cost per acquisition of customers, among other things, defendants presented a misleading picture of XM's business and prospects.  Thus, instead of truthfully disclosing during the Class Period the true risks that XM was exposed to, defendants caused XM to conceal the truth.

55.    Defendants' false and misleading statements had the intended effect and caused XM's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $36.93 per share on July 28, 2005.

56.    As a direct result of defendants' disclosures on February 16, 2006, April 27, 2006 and May 24, 2006, XM's common stock price fell precipitously.  These drops removed the inflation from

the price of XM's securities, causing real economic loss to investors who had purchased the Company's securities during the Class Period.

57.     The more than 60% decline in the price of XM's common stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of XM's common stock price declines negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of XM's securities and the subsequent significant decline in the value of XM's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

58.     At all relevant times, the market for XM's securities was an efficient market for the following reasons, among others:

(a)     XM's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, XM filed periodic public reports with the SEC and the NASDAQ;

(c)     XM regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    XM was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

59.    As a result of the foregoing, the markets for XM's securities promptly digested current information regarding XM from all publicly available sources and reflected such information in the prices of the securities. Under these circumstances, all purchasers of XM's securities during the Class Period suffered similar injury through their purchase of XM's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

60.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of XM who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

61.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding XM's business, operations, management and the intrinsic value of XM's securities; (ii) enable Panero and other Company insiders to sell 2.66 million shares of their personally-held XM stock for gross proceeds in excess of $75.8 million; and (iii) cause plaintiff and other members of the Class to purchase XM's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

63.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for XM's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of XM as specified herein.

65.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of

conduct as alleged herein in an effort to assure investors of XM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about XM and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of XM's securities during the Class Period.

66.    Panero's primary liability, and controlling person liability, arises from the following facts: (i) Panero was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (ii) Panero, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) Panero enjoyed significant personal contact and familiarity with the other defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) Panero was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

67.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing XM's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and

earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of XM's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of XM's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired XM's securities during the Class Period at artificially high prices and were damaged thereby.

69.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiff and the other members of the Class and the marketplace known the truth regarding XM's financial results, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their XM's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

71.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against Defendant Panero

72.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.    Panero acted as a controlling person of XM within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level positions, and his ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Panero had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. Panero was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.    As set forth above, XM and Panero each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of his position as a controlling person, Panero is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: June 30, 2006                                Respectfully Submitted,

Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.L.C.
1100  New York Avenue, N.W.
Suite 500 West Tower
Washington, D.C. 2005
Telephone:  202-408-4600
Facsimile 202-408-4699

SCHATZ & NOBEL, P.C.
Andrew M. Schatz
Jeffrey S. Nobel
Nancy A. Kulesa
One Corporate Center
20 Church Street, Suite 1700
Hartford, Connecticut 06103
Telephone: (860) 493-6292
Facsimile: (860) 493-6290